UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ELISEE CHERY,<br>　　*Plaintiff*, | )<br>)<br>) | 3:19-cv-1592 (KAD) |
| v. | )<br>) | |
| TOWN OF ENFIELD,<br>　　*Defendant*. | )<br>) | JANUARY 23, 2023 |

<u>**MEMORANDUM OF DECISION**</u>
<u>**RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 57)**</u>

Kari A. Dooley, United States District Judge:

This action arises out of Plaintiff Elisee Chery's termination from his position as a probationary police officer with the Enfield Police Department ("EPD"). Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* (Count One), the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 (Count Two), and 42 U.S.C. § 1983 (Count Three) against the Town of Enfield ("Defendant" or "Enfield"). Principally, Plaintiff alleges that his termination was due to discrimination on account of his race, color, and national origin or ancestry. Pending before the Court is a motion for summary judgment filed by Enfield, which Plaintiff opposes, in part. For the following reasons, the motion for summary judgment is GRANTED in part and DENIED in part.

**Relevant Facts**

The following facts are taken from Defendant's Local Rule 56(a)(1) Statement of Material Facts ("Def. LRS," ECF No. 57-2), the Plaintiff's response thereto ("Pl. LRS," ECF No. 70), and the parties' exhibits.

Plaintiff is a Black man of Haitian descent and speaks with a slight accent. Def. LRS at 1 ¶ 2; Pl. LRS. at 1 ¶ 2. Enfield hired Plaintiff as a police officer with the EPD in June 2017, subject

to a one-year probationary period. Def. LRS at 1 ¶ 3. Prior to working for the EPD, Plaintiff was a police officer with the Metropolitan Police Department in Washington, D.C. for three years. Def. LRS at 2 ¶ 6; Pl. LRS at 2 ¶ 6.

As a lateral hire, Plaintiff was required to enter EPD's Field Training and Evaluation Program ("field training"). Def. LRS at 2 ¶ 7. EPD's field training is a 16-week program consisting of five phases to evaluate and test new recruits. Def. LRS at 2 ¶¶ 8, 10.[1] The minimum amount of time in field training is 10 weeks if a lateral hire meets standards, as they can advance to the next phase sooner. Def. LRS at 2 ¶ 11. The maximum amount of time in field training is 20 weeks if a lateral hire requires additional training. *Id.* Trainees are assigned to various shifts and supervised by multiple Field Training Officers ("FTO"). Def. LRS at 2–3 ¶ 12. FTOs train new officers and evaluate their performance throughout field training. Def. LRS at 3 ¶ 13. A trainee's performance is evaluated and documented in Daily Observation Reports ("DOR"), the Field Training Coordinator's Weekly Reports, and End of Phase Evaluations. Def. LRS at 3 ¶ 17.

DORs are completed exclusively by FTOs, and rate trainees' performances in multiple areas on a scale from 1 to 7. Def. LRS at 3 ¶ 18. A rating of 1, 2, or 3 is "unacceptable" and a rating of 4 is the minimum acceptable standard. *Id.* DORs also contain a narrative portion where FTOs can provide additional information, highlight the most and least satisfactory performances of the day, and make recommendations. *Id.* The Field Training Coordinator completes a Weekly Report on a weekly or biweekly basis from information contained in the DORs as well as any

---

[1] Phase I is designed to acclimate a trainee to the EPD and teach the major components of officer safety, orientation, and basic investigations. Def. LRS at 4 ¶ 23. By the end of Phase I, a trainee is expected to handle 25 percent of officer responsibilities. *Id.* During Phase II, a trainee undertakes a larger volume of calls, continues to develop their skills, including in investigating, and is expected to handle 50 percent of officer responsibilities. Def. LRS at 4 ¶ 24. During Phase III, a trainee performs investigations on their own and is expected to handle 75 percent of officer responsibilities. Def. LRS. At 4 ¶ 25. During the Final Phase, a trainee does 100 percent of the work and an FTO will only get involved if the trainee is about to do something unethical, immoral, illegal, or otherwise would embarrass the EPD, the officer, or civilians. Def. LRS at 4–5 ¶ 26.

personal knowledge the Field Training Coordinator might have from working the same call or shift with a trainee. Def. LRS at 3–4 ¶ 19. End of Phase Evaluations are completed by FTOs at the end of each field training phase. Def. LRS at 4 ¶ 20.

Officer Timothy Gerrish was Plaintiff's FTO for five weeks during Phase I, with Officer Vanessa Magagnoli assuming the FTO role for one week while Officer Gerrish was on vacation. Def. LRS at 5 ¶ 29; Pl. LRS at 8 ¶ 29. Officer Steven Prior was Plaintiff's FTO for five weeks during Phase II. Def. LRS at 6 ¶ 37; Pl. LRS at 12 ¶ 37. Officer Kevin Ragion was Plaintiff's FTO for his first two-week extension of Phase II. Def. LRS at 7 ¶ 46; Pl. LRS at 14 ¶ 46. Officer Nicholas King was Plaintiff's FTO for the second one-week extension of Phase II. Def. LRS at 9 ¶ 54; Pl. LRS at 16–17 ¶ 54. Sergeant Keith Parent was the Field Training Coordinator while Plaintiff was in field training. Def. LRS at 4 ¶ 22.

*Field Training Performance*

During his field training, Plaintiff received mixed reviews in the DORs prepared by his supervising FTOs, which were then used by Sergeant Parent to prepare the Weekly Reports. In many respects, and to the extent the DORs and Weekly Reports are critical of him, Plaintiff disputes the veracity and contents of the reports.

Officer Magagnoli reported that while Plaintiff generally interacted well with the public and other EPD personnel, as well as handling the majority of calls with her with professionalism, she also reported repeated problems with Plaintiff's geographic orientation, report writing, and neglecting to call out when he was on scene and calling back in when in service. Def. LRS at 5 ¶¶ 30–31. Officer Magagnoli also reported that she felt that Plaintiff had lied and been disrespectful to her one day while she was supervising him. Def. LRS at 5–6 ¶ 32. Plaintiff informed Sergeant Parent that he disagreed with Officer Magagnoli's characterization of the events, but Sergeant

3

Parent told Plaintiff that he had to sign the weekly report, or he would be kicked out of field training. Pl. LRS at 10 ¶ 32. Plaintiff also alleges that Sergeant Parent told him he would always believe his FTOs over Plaintiff because he "handpicked" them. Pl. LRS at 24 ¶ 82.

Officer Gerrish reported that Plaintiff interacted well with the public, handled himself well on calls, and was able to effectively deescalate potentially volatile situations through communications. Def. LRS at 6 ¶ 33. Officer Gerrish also reported that Plaintiff had issues with radio transmissions, department radio codes, geographic orientation, and report writing. Def. LRS at 6 ¶ 34. Officer Gerrish recommended that Plaintiff continue to work on his report writing as he required assistance in documenting all necessary information related to a burglary they investigated together. Def. LRS at 6 ¶ 36. Notwithstanding these identified concerns, Officer Gerrish passed Plaintiff at the end of Phase I. Def. LRS at 6 ¶ 35.

Officer Prior reported that Plaintiff had excellent communication with others and treated people in a professional and courteous manner, but also reported problems with his report writing and geographic orientation. Def. LRS at 6 ¶¶ 38–39. Sergeant Parent advised Plaintiff that he needed to focus on ensuring that his reports contained the information necessary to support a finding of probable cause. Def. LRS at 6–7 ¶ 40. According to Defendant, Officer Prior recommended to extend Plaintiff's time in Phase II by two weeks because he was not performing 50 percent of the work required to progress to Phase III and Sergeant Parent agreed with that recommendation. Def. LRS at 7 ¶¶ 41–42. Plaintiff disputes that the recommendation to extend Plaintiff's time in Phase II came from Officer Prior and alleges that Sergeant Parent told him that he was being extended on Phase II because he didn't do enough traffic stops. Pl. LRS at 13 ¶¶ 41–42.

Around the time Plaintiff was told his time in Phase II would be extended, he met with Captain Fred Hall and Sergeant Parent to discuss his performance. Def. LRS at 7 ¶ 43. Captain Hall advised Plaintiff that the extension would give him the opportunity to raise his performance and that he was there to support Plaintiff. *Id.* Prior to this meeting, Plaintiff had informed Captain Hall that he had a sister who was sick, and Captain Hall encouraged him to take time off work. *Id.* At the meeting, Captain Hall reiterated that Plaintiff should take time off if he needed it. *Id.* Plaintiff denies that Captain Hall encouraged Plaintiff to take time off. Pl. LRS at 14 ¶ 43.

Officer Prior thereafter reported a decline in Plaintiff's performance in report writing, geographic orientation, and radio skills, and demonstrated some officer safety issues. Def. LRS at 7 ¶ 44. Officer Prior also reported that Plaintiff had trouble locating a specific bridge in Enfield and explained that he had never been there before. Def. LRS at 7 ¶ 45. However, Officer Gerrish advised Officer Prior that Plaintiff had been to that same bridge with him. *Id.*

Officer Ragion, Plaintiff's FTO for his first field training extension, reported that Plaintiff exhibited professionalism, exceptional communication skills, and had significant improvements in report writing. Def. LRS at 8 ¶ 47. Officer Ragion also reported that Plaintiff continued to struggle with radio communications, geographic orientation, driving, and knowledge of criminal and motor law, general orders, and policy. Def. LRS at 8 ¶ 48 Officer Ragion also conveyed two incidents in which Plaintiff returned to the patrol vehicle while other officers were still on scene and made excuses for doing so. Def. LRS at 8 ¶ 49. Officer Ragion recommended that Plaintiff be extended for another week with a different FTO for a second opinion. Def. LRS at 8 ¶ 50. Officer Ragion further recommended that Plaintiff work on listening to the radio for other officers, studying maps to help with his geographic orientation, and improving his knowledge of motor vehicle and criminal statutes. Def. LRS at 8 ¶ 51. Sergeant Parent agreed with Officer Ragion's

recommendation to extend Plaintiff's field training for a second time and conveyed that recommendation to Captain Hall. Def. LRS at 8 ¶ 52.

According to Defendant, Plaintiff thereafter had another meeting with Captain Hall and Sergeant Parent in which he was told that his Phase II training would be extended again by another week, that his performance was not where it needed to be, and that if he wanted to succeed, he had to put in more effort and show consistent improvement. Def. LRS at 8–9 ¶ 53. Plaintiff denies that this meeting occurred and alleges that it was Officer Ragion who told Plaintiff his Phase II training would be extended again. Pl. LRS at 16 ¶ 53.

Officer King, Plaintiff's FTO for his second Phase II extension, reported that his report writing was of consistently good quality, but that he continued to be unaware of EPD's general orders and motor vehicle statutes (and that Plaintiff admitted he had not read them), and inconsistently responded to different situations. Def. LRS at 9 ¶¶ 54–55. Officer King also reported that he gave Plaintiff over two hours of remedial training on various statutes and procedures, but that he was not responding to the training. Def. LRS at 9 ¶ 56. Plaintiff alleges that Officer King only spent time training him on how to fix his bag so he would not fumble for paperwork. Pl. LRS at 17 ¶ 56. In one of his DORs, Officer King opined that he did not foresee Plaintiff taking the initiative to learn the information on his own, that he was addressing the same issues with Plaintiff that prior FTOs had noted, and that Plaintiff's failure to improve was the result of him not investing time into increasing his job knowledge. Def. LRS at 9 ¶ 57.

*Separation from the EPD*

After Plaintiff's second extension of Phase II, Sergeant Parent reviewed his training records, spoke to his FTOs, and considering that Plaintiff was 13 weeks into a 16-week program and had not yet passed Phase II, Sergeant Parent recommended that Plaintiff's employment with

6

the EPD be terminated. Def. LRS at 9–10 ¶ 58. Sergeant Parent believed that Plaintiff could not complete the remainder of field training in the time allotted. *Id.* At the request of Captain Golden, Sergeant Parent prepared an 11-page memorandum detailing his concerns with Plaintiff's performance for Chief Sferrazza to review. Def. LRS at 10 ¶ 60. The memorandum recited DORs from the various FTOs that supervised Plaintiff during field training, including Officers Magagnoli, Prior, Ragion, and King. Parent Memo., Ex. AA at 10. Drawing from these reports, the memorandum also called into question Plaintiff's integrity, truthfulness, demeanor, character, and work ethic. *Id.* at 3, 9–10.

Prior to this occurrence, Sergeant Parent had never been asked to write such a memorandum, and Plaintiff denies Defendant's allegation that it is standard practice for the Chief of Police to request a written summary when there is a recommendation that a recruit's employment be terminated. Def. LRS at 10 ¶ 61; Pl. LRS at 19 ¶ 61. Chief Sferrazza decided to terminate Plaintiff's employment based on the reports of Plaintiff's FTOs as detailed in Sergeant Parent's memorandum. Def. LRS at 10 ¶ 62; Pl. LRS at 23 ¶ 78.

*Discriminatory Incidents*

During his field training, Plaintiff experienced what he alleges to be racially motivated harassment. He alleges that several of his supervising FTOs made statements concerning his accent, race, and national origin. According to Plaintiff, Officer Ragion repeatedly made fun of Plaintiff's accent, told him that he would be "better off being in Hartford," repeatedly asked Plaintiff where he was from and how he got here, told Plaintiff that Haiti is one of the poorest countries in the world, and asked Plaintiff how many siblings he had. Pl. LRS at 26 ¶ 92.

Officer King, before and while he was Plaintiff's FTO, also repeatedly made fun of Plaintiff's accent. On one occasion, Officer King drove Plaintiff to the East Windsor town line to

meet another police officer with the East Windsor Police Department just so the officer could hear Plaintiff's accent. Pl. LRS at 27 ¶ 93. During this incident, Officer King and the East Windsor officer laughed at Plaintiff's accent, told him he "sound[ed] funny," questioned him about where he was from, including asking Plaintiff whether he was from Jamaica or Africa and whether he knew a particular family in Hartford. *Id.* When Plaintiff told them he was from Haiti, they asked where Haiti was located, laughed about it being a poor country, and asked him whether he had his "papers" and how he got to this country. *Id.* Officer King also allegedly told Plaintiff he sounded aggressive and repeatedly asked him if he was from Jamaica or Africa. Pl. LRS at 27 ¶ 94.

Another one of his FTOs, Officer Prior, was present when another EPD officer made fun of Plaintiff's accent and national origin. Officer Prior drove Plaintiff to meet with Office Michael Emons, who told Plaintiff that he would be "better off" with the Hartford Police Department because he belonged with "his people" and not in Enfield and referred to there being more of Plaintiff's "kind" in Hartford. Pl. LRS at 26 ¶ 90. On another occasion, while responding to a call where two Black men were present, Officer Emons, who also responded to the call with Officer Prior and Plaintiff, remarked that Plaintiff was "right at home with [his] people here" and laughed. Pl. LRS at 26 ¶ 91.

Plaintiff also alleges that other EPD officers made discriminatory statements. Plaintiff alleges that EPD officers made fun of his accent and the way he talked both over radio and in person in the breakroom, report-writing room, and while out on calls. Pl. LRS at 27 ¶ 95. This included saying "boola, boola, boola"[2] when officers couldn't understand Plaintiff, and telling him

---

[2] Plaintiff testified in his deposition that "boola, boola, boola" was how his accent sounds "when you don't know how my language goes or they [were] mak[ing] fun [of] it, trying to make it sound, say that's how I sound. . . . They were mocking [] my language because they don't know any Haitian word, any Creole word. So they were just making sounds to them like what I'm saying, but that was no word, no nothing. They were just noises, ma'am. They were mocking me." Pl. Dep. 181:4–182:7.

8

to "speak English" and laughing at him over the radio. *Id.* Plaintiff was also ignored on the radio. *Id.* When Plaintiff visited the EPD breakroom, the room would fall silent, and officers would make fun of the Haitian food he brought into work. *Id.* Plaintiff attempted to discuss these events with Officer Gerrish, who responded that "it's not the case," "it's not like that," "nobody is racist," and characterized Plaintiff's concerns as "bring[ing] up the race card." Pl. LRS at 24–25 ¶ 82. Plaintiff thereafter kept his complaints to himself because he believed there was no point in vocalizing his disagreements with any DORs or reporting his negative interactions with his FTOs. *Id.*

Plaintiff also alleges that while he was in Phase I, Sergeant Lefebvre ran his license plate while he was exiting the EPD parking lot. Pl. LRS at 28 ¶ 96. Sergeant Lefebvre reported to Officer Gerrish, Plaintiff's FTO at the time, that Plaintiff's out-of-state license plate was expired and went as far as to write and place an undated memorandum to that effect in Plaintiff's file without Plaintiff or Officer Gerrish's knowledge. *Id.*; *see also* Lefebvre Memo., Ex. E. Plaintiff maintains that his license plate was not expired when Segreant Lefebvre ran the check, but was going to expire in a few days, as he was in the process of transferring his registration to Connecticut. Pl. LRS at 28 ¶ 97. Plaintiff alleges that Officer Gerrish told him that Sergeant Lefebrve ran his license plate and asked Officer Gerrish "Is this guy worth keeping? Because his plate is about to be expired soon, then I can write him up when his plate expires." *Id.* Plaintiff then drove to Virginia to renew his registration before it expired. *Id.* Officer Gerrish alleges that Sergeant Lefebrve told him he ran Plaintiff's license plate and discovered it was expired, and that he spoke to Plaintiff thereafter to make sure he wasn't driving a car with expired plates. Pl. LRS at 28 ¶ 98. Officer Gerrish was not aware of the memorandum that Sergeant Lefebrve wrote and placed in Plaintiff's file. *Id.*

**Standard of Review**

9

The standard under which courts review motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, the inquiry being conducted by the court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Once the movant meets his burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright*, 554 F.3d at 266; *accord Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless

there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Discussion**

Preliminarily, the Court observes that Plaintiff clarifies that he did not intend to bring a retaliation claim under CFEPA in Count Two and further, that summary judgment should enter for the Defendant on Count Three, brought under § 1983, because he cannot establish *Monell* liability. The only remaining question is whether summary judgment should enter for Defendant on Counts One and Two with respect to the discrimination claims.

"Title VII makes it 'an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge . . . or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 199 (2d Cir. 2017) (quoting 42 U.S.C. § 2000e-2(a)(1)). Discrimination claims pursuant to Title VII and CFEPA[3] are

---

[3] "CFEPA claims are analyzed in the same manner as those under Title VII." *Sample v. Wal-Mart Stores, Inc.*, 273 F. Supp. 2d 185, 189 (D. Conn. 2003), *aff'd*, 108 F. App'x 15 (2d Cir. 2004) (summary order), (citing *Brittell v. Dep't of Correction*, 247 Conn. 148, 164 (1998)).

11

analyzed using the *McDonnell Douglas* burden-shifting framework. *See McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006). The *McDonnell Douglas* test proceeds as follows: (1) plaintiff "bears the minimal burden of setting out a prima facie discrimination case," (2) if plaintiff satisfies its burden, plaintiff "is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action," and (3) if the defendant proffers a legitimate, nondiscriminatory reason, "the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination." *Id.* (internal quotation marks and citations omitted).

To establish a *prima facie* discrimination case, plaintiff must show: (1) "he belonged to a protected class," (2) "he was qualified for the position," (3) "he suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (internal quotation marks and citations omitted). If a plaintiff does not have direct evidence of discriminatory intent, plaintiff may present evidence of disparate treatment, such as evidence that his employer treated him less favorably than similarly situated employees outside of his protected class, to support an inference of discriminatory intent. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89–90 (2d Cir. 2019) (citing *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).

In seeking summary judgment, Defendant argues that Plaintiff cannot establish a *prima facie* case of discrimination because there is no evidence to support an inference of discriminatory animus. Defendant further asserts that Plaintiff was terminated because he failed to advance as necessary through the field training program, which is a legitimate nondiscriminatory reason for his termination. Plaintiff counters that there is sufficient record evidence to raise a genuine issue of material fact as to each of these issues.

Defendant relies principally on the fact that any discriminatory remarks allegedly made by Plaintiff's FTOs or other EPD officers were not made in connection with their evaluation of Plaintiff's performance, and that Sergeant Parent, who recommended Plaintiff's separation, and Chief Sferrazza, who made the final decision to terminate Plaintiff's employment, are not alleged to have made any discriminatory remarks.[4] In Defendant's view, these are merely "stray remarks" made by non-decisionmakers that cannot support an inference of discrimination.[5] Plaintiff argues that the same people who were making discriminatory remarks were the officers writing daily and weekly reports of Plaintiff's performance in field training, which in turn were the basis for Sergeant Parent's weekly evaluations and his memorandum recommending that Plaintiff be dismissed from field training. The Court agrees with the Plaintiff.

Under a cat's paw[6] theory of employment discrimination liability, an employee may "hold his employer liable for the animus of a supervisor who was not charged with making the ultimate

---

[4] Defendant also argues that Plaintiff cannot raise an inference of discrimination because his identified comparator, Officer Roche, is not "similarly situated in all material respects" to Plaintiff. *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 2011). The Court agrees with the Defendant. Officer Roche is a white officer who went through field training the same time as Plaintiff and did advance out of field training. Plaintiff, however, has presented no evidence of how Officer Roche performed during field training. The Court cannot evaluate whether Plaintiff's performance as detailed by the FTOs was comparable to Officer Roche's, and therefore, whether Officer Roche advancing out of field training while Plaintiff was asked to resign is evidence of disparate treatment that would establish an inference of discrimination.

[5] The Second Circuit has instructed that "when considering whether isolated 'stray remarks' are probative of discriminatory intent," district courts should consider that "[t]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination," whereas "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (quotation marks and citation omitted). "In determining whether a remark is probative," courts should therefore assess: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Id.*; *see also, e.g.*, *Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys.*, 862 F. Supp. 2d 127, 152 (D. Conn. 2012) (applying same factors). However, the Second Circuit has also explained that "remarks are not 'stray' where they are sufficiently repetitive and severe so as to prove sufficient evidence of discriminatory intent." *Naumovski v. Norris*, 934 F.3d 200, 216 n.47 (2d Cir. 2019).

[6] The phrase "cat's paw" derives from "an Aesop fable, later put into verse by Jean de La Fontaine, in which a wily monkey flatters a naïve cat into pulling roasting chestnuts out of a roaring fire for their mutual satisfaction; the monkey, however, 'devour[s] . . . them fast,' leaving the cat 'with a burnt paw and no chestnuts' for its trouble." *Vasquez*, 835 F.3d at 271–72.

13

employment decision." *Hernandez v. JRK Residential Group, Inc.*, 2021 WL 6498198, at *4 (D. Conn. June 25, 2021) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). The cat's paw metaphor "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Vasquez v. Empress Ambulance Service, Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (citing *Cook v. IPC Intern. Corp.*, 673 F.3d 625, 628 (7th Cir. 2012)). "Only when an employer in effect adopts an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision, can the employee's motivation be imputed to the employer and used to support a claim under Title VII." *Id.* at 275 (emphasis in original).

In *Vasquez*, the plaintiff, having received unsolicited sexual photographs from a coworker, promptly informed her supervisor and filed a formal complaint. *Id.* at 269. The offending coworker discovered the complaint and thereafter gave the employer allegedly false documents purporting to show the plaintiff's "consent to and solicitation of a sexual relationship." *Id.* "In reliance on those documents, and notwithstanding [the plaintiff's] offers to produce evidence in refutation, [the plaintiff's] employer immediately fired her on the ground that she had engaged in sexual harassment." *Id.* The Second Circuit reversed the district court's dismissal of the claim and held that the employer's alleged negligence in crediting the coworker's accusations "to the exclusion of all other evidence, and specifically declining to examine contrary evidence tendered by [the plaintiff], when it knew, or with reasonable investigation, should have known of [the coworker's] retaliatory animus," caused the accusations to form the sole basis for the employer's decision to terminate the plaintiff. *Id.* at 275. As a result of the employer's negligence, the biased coworker

played a "meaningful, and indeed decisive," role in the plaintiff's termination, and the coworker's retaliatory animus could be imputed to the employer. *Id.* (quotation marks omitted).

Finally, courts have consistently held that an employer cannot insulate itself from liability by cabining hiring and firing decisions to detached decisionmakers who simply rely on information and recommendations from others. *See e.g. Krause v. Kelahan*, 575 F. Supp. 3d 302, 310 (N.D.N.Y. 2021) (finding there was ample evidence that the final decisionmaker deferred to the recommendation of an employee with a discriminatory motive to terminate the plaintiff's employment, and thus "the recommending employee amount[ed] to a supervisor, and any discriminatory animus found attributable to him can be imputed directly to the employer, no cat's paw required") (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 431, 447 (2013)); *Marshall v. The Rawlings Company LLC*, 854 F.3d 368, 378–79 (6th Cir. 2017) ("[T]he cat's paw theory of liability applies in situations involving more than one layer of supervision between the plaintiff and the ultimate decisionmaker.").

Here, the discriminatory remarks made by Plaintiff's FTOs and others are direct evidence of racial animus. And the reports prepared by these same FTOs regarding Plaintiff's performance are therefore not so easily separated from the final decision by Chief Sferrazza to request Plaintiff's resignation in lieu of termination. Specifically, the reports from FTOs who made allegedly made discriminatory remarks or were present while other EPD officers made discriminatory remarks to Plaintiff featured prominently in the memorandum prepared by Sergeant Parent. Sergeant Parent testified that the memorandum he was asked to prepare was "an executive summary of the Daily Observation Reports prepared by [Plaintiff's] field training officers" and agreed that for "the most part," he relied on just the DORs that were provided to him when writing the memorandum. Parent Dep. 21:1-9. Sergeant Parent had never written a memorandum to aid in the determination of

15

whether to retain or release a trainee. *Id.* at 17:8-13, 18:15. The memorandum consisted primarily of recitations from the DORs prepared by Officers Prior, Ragion, and King during Plaintiff's field training extensions (all three of which are alleged to have either made discriminatory comments to or about Plaintiff or were present when other EPD officers made discriminatory remarks to or about Plaintiff). Parent Memo., Ex. AA at 4–11.

Moreover, the memorandum went above and beyond a simple summary of the FTO reports. A substantial portion of the memorandum was dedicated to challenging Plaintiff's character, overall demeanor, and integrity as a police officer. For example, Sergeant Parent wrote that several incidents called into question whether Plaintiff "has poor recall ability, is unable to adequately interpret and act on direction that he is given, is quick to make excuses in an attempt to get out of distasteful tasks, or if he simply lacks integrity." *Id.* at 2–3. Sergeant Parent also wrote that Plaintiff "repeatedly demonstrates that he would much rather someone else tell him the answer rather than even attempt to find the answer on his own." *Id.* at 8. Sergeant Parent opined that Plaintiff "has shown on multiple occasions that he is content to take what is perceived as the path of least resistance, or even termed as 'laziness' as is noted in the Phase II Extension end of phase report prepared by Officer Ragion." *Id.* at 9–10.

Accordingly, there is a genuine issue of material fact as to whether the DORs are accurate, whether any inaccuracies are the result of racial animus, and the extent to which such animus infected Sergeant Parent's recommendation and Chief Sferrazza's final decision to terminate Plaintiff's employment. A reasonable jury could find that Sergeant Parent knew, or with reasonable investigation, should have known, that the veracity of the DORs submitted to him by the FTOs were tainted by racial animus. And whether, by relying upon the DORs, Sergeant Parent afforded

the biased employees an outsized role in his recommendation to terminate Plaintiff's employment is a question of fact for the jury. *See Vasquez*, 835 F.3d at 275.[7]

To the extent that Defendant relies upon the Plaintiff's failings during his field training as documented in the DORs and weekly evaluations as the legitimate non-discriminatory reason for his termination, the issues of fact identified above preclude summary judgment on the issue of pretext as well.

**Conclusion**

For the foregoing reasons, the Town of Enfield's motion for summary judgment is GRANTED as to Count Three and any retaliation claim under CFEPA and DENIED as to the Title VII and CFEPA discrimination claims in Counts One and Two.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of January 2023.

                                                /s/ Kari A. Dooley
                                                KARI A. DOOLEY
                                                UNITED STATES DISTRICT JUDGE

---

[7] Although courts have found no cat's paw liability if the final decisionmaker has conducted an independent investigation and exercised judgment independent from the allegedly biased employee, *see, e.g.*, *Rajaravivarma*, 862 F. Supp. 2d at 158–59 (no cat's paw liability where final decisionmaker determined that a professor's tenure application contained "deficiencies based on his initial independent assessment of the student evaluations and his publications prior to reviewing any recommendations" from the allegedly biased employees); *Jones v. Dep't of Children and Families*, 172 Conn. App. 14, 31 (2017) ("Because the final termination decision was made after an independent review of the plaintiff's performance based on concrete, objective factors, the court correctly concluded that the cat's paw theory of liability did not apply to this case."), Defendant has presented no argument, testimony, affidavit, or other evidence to suggest that Chief Sferrazza had any personal knowledge of Plaintiff's performance in field training apart from Sergeant Parent's memorandum in making his decision to terminate Plaintiff's employment. Defendant acknowledges that Chief Sferrazza, in his meeting with Plaintiff, reviewed the concerns contained in Sergeant Parent's memorandum and then asked for Plaintiff's resignation. Pl. Dep. 164:7-20. So, while there is no evidence that Chief Sferrazza harbored any discriminatory animus against Plaintiff, there is also no evidence that he had independent knowledge of Plaintiff's performance other than what was contained in the memorandum.